UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
SECURITIES AND EXCHANGE                             )
COMMISSION,                                          )
                                                    )
                          Plaintiff,                 )        Civil Action No.
                                                    )
          v.                                         )
                                                    )
CHRISTOPHER R. ESPOSITO,                            )        JURY TRIAL DEMANDED
ANTHONY JAY PIGNATELLO,                             )
JAMES GONDOLFE,                                      )
RENEE GALIZIO,                                       )
LIONSHARE VENTURES LLC, and                         )
CANNABIZ MOBILE, INC.                               )
                                                    )
Defendants.                                          )
_____)

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the

following against Defendants Christopher R. Esposito ("Esposito"), Anthony Jay Pignatello

("Pignatello"), James Gondolfe ("Gondolfe"), Renee Galizio ("Galizio"), Lionshare Ventures LLC

("Lionshare"), and Cannabiz Mobile, Inc. ("Cannabiz"):

## SUMMARY

1.      This case involves Esposito's scheme to defraud investors by misappropriating for

his own purposes funds from investors in Lionshare, and concealing his ownership and control of the

publicly-traded company Cannabiz in order to enrich himself and others by colluding in the sale of

millions of shares of Cannabiz into the public market, in violation of SEC statutes and regulations.

2.      Esposito accomplished the first phase of his fraudulent scheme by (a) raising more

than $550,000 from investors between June 2011 and June 2012 in an unregistered offering of

securities in his company Lionshare; (b) spending almost $300,000 of Lionshare investor funds for unauthorized personal expenses; and (c) using $75,000 of Lionshare investor funds to acquire control of Cannabiz by purchasing all of its convertible debt.

3.     In the second phase of his fraudulent scheme, between May 2012 and August 2015, Esposito, with Pignatello, concealed his de facto control of Cannabiz and a large percentage of Cannabiz's securities in order to profit by evading SEC Rule 144 [17 C.F.R. §230.144], which limits securities sales by affiliates, such as control persons.  Esposito did this by, among other things, (a) installing Gondolfe as the sole officer and director of Cannabiz—even though Esposito secretly controlled the company—to make false statements in Cannabiz's public filings and other documents; (b) paying third-party stock promoters to tout Cannabiz in order to increase its stock price and trading volume; (c) selling significant amounts of Cannabiz convertible debt to others for almost $304,000; and (d) with Pignatello and Galizio, selling millions of shares of Cannabiz stock directly into the market.

4.     The Defendants' conduct violated various registration, disclosure and antifraud statutes and rules and regulations of the SEC, including Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

5.     Based on these violations, the Commission seeks the following relief: (i) entry of permanent injunctions prohibiting Esposito, Pignatello, Gondolfe, Lionshare, and Cannabiz from engaging in future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act; (ii) entry of permanent injunctions prohibiting all Defendants from engaging in future violations of Section 5 of the Securities Act; (iii) an order requiring all Defendants to disgorge their ill-gotten gains and pay pre-judgment interest; (iv) an order requiring

all Defendants to pay appropriate civil monetary penalties; (v) an order barring Esposito, Pignatello, and Gondolfe from serving as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and (vi) an order barring Defendants Esposito, Pignatello, Gondolfe, Lionshare, and Galizio from participating in any offering of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b) and 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.      Venue is proper in this district because certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of Massachusetts.  Also, defendants Esposito, Gondolfe, Lionshare, and Cannabiz reside, or are found, within the District of Massachusetts.

9.      The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, practices, and course of business alleged herein.

## DEFENDANTS

10.     Christopher R. Esposito, age 49, is a resident of Topsfield, Massachusetts, and is the Managing Director of Lionshare.

11.     Anthony Jay Pignatello, age 46, is a resident of Manhattan Beach, California, and was a consultant to Cannabiz, as well as a former Secretary of Cannabiz.

12.     James Gondolfe, age 48, is a resident of Cambridge, Massachusetts, and is the Chairman and President of Cannabiz.

13.     Renee Galizio, age 44, is a resident of Loxahatchee, Florida.

14.     Lionshare Ventures LLC is a privately-held corporation with its principal place of business in Danvers, Massachusetts.  It is purportedly a "business incubator for microcap companies" (a microcap company is a business with a market capitalization of $50 million to $300 million). Lionshare's securities have never been registered with the Commission, and it has never registered any securities offerings with the Commission.

15.     Cannabiz Mobile, Inc. is a corporation purportedly based in Cambridge, Massachusetts, but in reality operated out of shared office space with Lionshare.  Cannabiz initially claimed to be in the business of mineral exploration in Brazil and, later, servicing businesses in the medical marijuana industry.  It had other names and purported business operations prior to the adoption of its current name, Cannabiz, including ReBuilder Medical Technologies, Inc. ("ReBuilder" from March 2007 through August 2012) and Lion Gold Brazil, Inc. ("Lion Gold" from August 2012 through May 2014). Cannabiz's stock is not registered with the Commission and it has never registered any securities offerings with the Commission.  Since at least March 2007, Cannabiz (and its predecessors) has been quoted on the Over-the-Counter (OTC) securities markets ("OTC Markets").[1]

---

[1] The OTC Markets are decentralized markets that do not have actual physical locations where stocks can be bought and sold.  Buyers and sellers in the OTC Markets trade with one another through various communication modes such as the telephone, email, and proprietary electronic trading systems.

## THE FRAUDULENT SCHEME

### A.    Esposito Uses Lionshare Investor Proceeds for Unauthorized Personal Purposes

16.     Between approximately June 2011 and June 2012, Esposito and Lionshare raised at least $556,452 from investors through an offering of Lionshare "Class 'B' Membership Interest Shares."  The Membership Interest Shares were priced at $25,000 per "Unit," and each Unit entitled the investor to 200,000 shares of Lionshare membership interest, or 1% equity ownership, in Lionshare.

17.     Esposito and Lionshare did not file a registration statement with the SEC for the offering.  Instead, on or about October 16, 2012—more than one year after the offering began—they filed a form with the SEC claiming that the offering qualified for an exemption from registration under Rule 506 of Securities Act Regulation D ("Rule 506") [17 C.F.R. 230.506], which allows companies to raise capital through the sale of securities without having to register the securities with the SEC so long as certain requirements are followed.

18.     Esposito and Lionshare failed to satisfy any of the exemptions from registration contained in the securities laws, however, including Rule 506.  Among other violations, they (i) conducted a general solicitation that including cold-calling unaccredited and unsophisticated investors and (ii) failed to provide audited financial statements to investors who did not meet the "accredited investor" definition in Rule 501(A) of Securities Act Regulation D.

19.     Esposito and Lionshare represented to investors and potential investors in emails and in the Lionshare private placement memorandum ("PPM") that the offering proceeds would be used to acquire an OTC public company to be named Lion Gold, which, in turn, would acquire mineral interests and mining operations.  Esposito further represented that following the acquisition of Lion

Gold, Lionshare investors would receive one share of common stock of Lion Gold for each Lionshare Membership Interest Share they held.

20.     The PPM also provided a breakdown of the use of Lionshare investor proceeds, including "business acquisition costs (50%)," "promotion & marketing (25%)," "operations, salaries and administrative (12.5%)," "regulatory fees, filings and legal expenses (7.5%)," "working capital (4%)," and "offering expense (1%)."

21.     Contrary to these representations, however, Esposito used more than $290,500 of investor funds for unauthorized personal and business expenses unrelated to his salary or the acquisition of Lion Gold.  For example, he transferred more than $109,300 to his personal bank accounts.  He also directly spent more than $27,300 of Lionshare investor funds on personal expenses, including more than $5,100 on clothing, more than $5,000 on groceries and convenience store purchases, more than $14,000 on personal goods and services (such as iTunes, video game stores, toy stores, pet care, and dry cleaners), and more than $2,700 on youth sports fees.

22.     In addition, between August 2011 and November 2012, Esposito used approximately $153,000 of Lionshare investor funds to form a private Brazilian corporation named Lion Mineracao Ltda. ("Lion Mineracao") for the purported purpose of mining in Brazil.  Despite using Lionshare investors' money to fund Lion Mineracao, however, Esposito owned 99.99% of Lion Mineracao: Lionshare investors had no ownership interest in Lion Mineracao. (The other .01% was owned by R.A., an individual then residing in Brazil whom Esposito hired to be his sole representative in Brazil.)

**B.**     **Esposito Uses Investor Funds to Secretly Acquire and Hide Control of Cannabiz**

23.     In late May 2012, Esposito and Lionshare made a deal to acquire, and hide control of, the publicly-traded company Cannabiz (then known as ReBuilder) by using approximately $75,000

of the Lionshare investors' money to purchase five ReBuilder convertible promissory notes ("ReBuilder Notes") that collectively amounted to $711,238 in debt obligations, representing all of ReBuilder's outstanding debts.  Convertible debt, such as the ReBuilder Notes, is a type of financial instrument that, upon a stated event, can be exchanged for a pre-determined number of shares of a company's common stock.

24.     The ReBuilder Notes gave Esposito effective control over ReBuilder because they were convertible at any time into 711,238,000 shares of ReBuilder common stock (almost 18 times the amount of outstanding shares of ReBuilder at that time).  On or about May 29, 2012, Esposito assigned one ReBuilder Note to Lionshare ("Lionshare ReBuilder Note") and assigned the other four ReBuilder Notes to his brother-in-law ("Family ReBuilder Notes").   In reality, however, Esposito used his brother-in-law in name only:  Esposito controlled the Family ReBuilder Notes, which were convertible into approximately 628 million ReBuilder shares.

25.     Also in May 2012, in an effort to hide his control of Cannabiz and evade SEC rules and regulations, Esposito installed R.A. (his Brazilian representative) as the President, Chief Executive Officer (CEO), Chief Financial Officer (CFO), Chairman, and sole member of the Board of Directors of ReBuilder.  Esposito then directed R.A. to hire Pignatello, first as a consultant to ReBuilder in May 2012, and then, in June 2012, as Secretary of the company.  Pignatello's duties included, among other things, making regulatory filings and assisting company attorneys in providing documents, such as so-called "opinion letters," which were required to facilitate public sales of Cannabiz securities.

26.     Even though Esposito had no official position with ReBuilder, he secretly controlled the company and funded its existence.

**C.**      **Esposito Deceives Financial Intermediaries in Order to Cause**
            **Stock Certificates to be Issued Without Restrictive Legends.**

27.      Under Rule 144 of the Securities Act, an "affiliate" of an issuer (here, ReBuilder) is a person or entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer. Because Esposito and Lionshare secretly controlled Rebuilder, they were affiliates of ReBuilder.  Esposito and Lionshare concealed their affiliate status, however, in order to profit by pursuing various transactions that were prohibited by the securities laws.

28.      By concealing his and Lionshare's status as affiliates of Rebuilder, Esposito was able to request that Rebuilder's transfer agent issue millions of shares of Rebuilder stock without a "restrictive" legend.  Such shares were issued to Esposito and others, including investors in the Lionshare offering who received their ReBuilder shares in exchange for Lionshare Membership Interest Shares.

29.      Transfer agents are SEC-registered financial institutions retained by publicly-traded companies to maintain accurate investor records and to issue or cancel stock certificates.  Esposito misled ReBuilder's transfer agent by providing documents which falsely represented that Lionshare was not an affiliate of ReBuilder.  By so doing, Esposito induced the transfer agent to issue ReBuilder stock certificates without restrictive legends.  Without the restrictive legends, these shares could be sold into the public market, even though Esposito and ReBuilder had not, in fact, complied with the applicable laws governing sales of shares owned or controlled by an affiliate.  Such fraudulent and misleading documents included the following:

- a "Seller's Representation Letter" dated June 22, 2012 and signed by Esposito stating that Lionshare was not an affiliate of Lion Gold (ReBuilder became known as Lion Gold after a name change in August 2012);

- an attorney's legal opinion letter dated June 29, 2012 stating that Lionshare was not an affiliate of Lion Gold and that the to-be issued ReBuilder common shares were "free trading common stock" not subject to "restrictive legend or transfer restrictions at any time on or after January 1, 2012"; and

- a ReBuilder corporate board resolution dated June 27, 2012 and signed by R.A. stating that the ReBuilder common shares are "free trading" and that ReBuilder "recognizes and approves the legal opinion of counsel. . . ."

30.     By hiding his and Lionshare's affiliate status in order to mislead the transfer agent and have the stock issued without a restrictive legend, Esposito evaded SEC Rule 144.  Among other things, this rule prohibits sales of securities from an affiliate prior to the completion of a one year holding period.  The one year holding period applied to the ReBuilder common stock that was transferred to Esposito and the Lionshare investors, since Esposito and Lionshare itself were affiliates of ReBuilder.

31.     On July 27, 2012, based on Esposito's misrepresentations about his and Lionshare's affiliate status, the transfer agent issued 47 stock certificates without restrictive legends, representing 18,236,000 shares of common stock of ReBuilder, to the Lionshare investors, including more than 3,675,000 shares to Esposito personally.

32.     On or about October 8, 2012, Esposito directed the transfer agent to issue additional certificates without restrictive legends in order to transfer 3.3 million of his personal shares to various investor relations "consultants."  Esposito directed these transfers as payment in exchange for the consultants causing promotional emails about Lion Gold to be blasted out to potential investors.

33.     The consultants received stock certificates without restrictive legends and thereafter sold 2,396,000 of their shares into the public market, generating profits of $62,835.  Esposito also sold 94,500 shares into the public market, generating personal profits of more than $1,950.  These

sales were in violation of the provisions of Rule 144, including the provisions imposing a one-year minimum holding period for sales of shares held by an affiliate.

34.     Esposito and Lionshare knew, or were reckless in not knowing, that these stock sales were prohibited under the Securities Act and the rules thereunder.

**D.     Esposito and Lion Gold Make Material Misstatements and Omissions in Public Documents**

35.     On November 16, 2012, Esposito caused Lion Gold to submit to OTC Markets for public disclosure an information statement that falsely represented that Lion Mineracao was a wholly owned operating subsidiary of Lion Gold.  This information statement was false and misleading because Esposito owned 99.99% of Lion Mineracao:  Lion Gold had no ownership stake in Lion Mineracao.

36.     The information statement also failed to disclose (i) the amount of Lion Gold convertible debt Esposito and Lionshare controlled through the ReBuilder Notes and (ii) the dilution of shareholder equity that would result if Esposito and Lionshare converted this debt into common stock.  Therefore, the public disclosure was false and misleading because it left investors unaware of the fact that Esposito actually controlled Lion Gold, owned all of its purported mineral assets, and could at any time significantly dilute existing shareholders' ownership interest in Lion Gold by converting the debt into equity.

37.     On January 8, 2013, Esposito caused Lion Gold to provide an amended disclosure statement to OTC Markets which contained the same misrepresentations as the November 16, 2012 document discussed above in paragraph 35.

### E.    Esposito Installs Gondolfe and Causes Lion Gold
####       to Make False Statements in Regulatory Filings

38.    In early 2014, Esposito and Pignatello were experiencing difficulties directing R.A.'s activities.  On March 5, 2014, Pignatello emailed Esposito, "[y]ou need to make it a priority to add someone friendly to the Board and someone that can sign things for us here (will speed everything up)."

39.    On or about April 3, 2014, Esposito forced out R.A. and replaced him with Gondolfe as the President, CEO, Chairman and sole member of the Board of Directors of Lion Gold.  At Esposito's direction, on April 21, 2014, Gondolfe hired Pignatello as a consultant to Lion Gold.  In that role, Pignatello prepared Lion Gold's financial statements, made regulatory filings, and assisted company attorneys in providing documentation, such as "opinion letters." Gondolfe routinely followed Esposito and Pignatello's directives.  Those directives included, among other things, signing Gondolfe's name on a corporate amendment prepared by Pignatello that falsely represented that Gondolfe had been Treasurer of Lion Gold in 2011 and 2012.  In actuality, Gondolfe had been hired in April 2014.

40.    In late April 2014, Pignatello submitted the false corporate amendment to the Nevada Secretary of State.  Pignatello knew, or was reckless in not knowing, that the corporate amendment he prepared and directed Gondolfe to sign and submit to the Nevada Secretary of State contained false information because Pignatello knew that Gondolfe was not employed by Lion Gold in 2011 or 2012.

41.    In May 2014, Pignatello prepared the following Annual Reports for Lion Gold, which he then submitted to OTC Markets to be made available to the public:

- Annual Report for the period ending December 31, 2012 (dated April 30, 2014).

- Annual Report for the period ending December 31, 2013 (dated May 4, 2014).  This document falsely identified Gondolfe as the Chief Financial Officer of Lion Gold as of December 31, 2013.

Gondolfe signed both of these Annual Reports.  Both of the Annual Reports (i) falsely stated that Lion Mineracao was a wholly-owned subsidiary of Lion Gold, and (ii) fraudulently concealed the fact that Esposito actually controlled Lion Gold, owned all of its purported mineral assets, and could at any time substantially dilute shareholder equity by converting debt into equity.

42.     Pignatello knew, or was reckless in not knowing, that the annual reports contained false information about Lion Mineracao, failed to disclose Esposito's control of Lion Gold, and falsely identified Gondolfe as the Chief Financial Officer of Lion Gold in 2013.

43.     Gondolfe knew, or was reckless in not knowing, that the annual reports falsely identified him as having served as the Chief Financial Officer of Lion Gold in 2013.

44.     On or about June 24, 2014, Lion Gold issued a press-release stating that the company had changed its name to Cannabiz and changed its business purpose from mining in Brazil to a mobile media and marketing company specializing in servicing businesses in the medical marijuana industry.

**F.      Esposito, Pignatello, and Gondolfe Backdate Convertible Notes in Order to Generate More Cannabiz Stock**

45.     In order to further profit by concealing Esposito's ownership and control of Cannabiz, and to evade the requirements of the Securities Act with respect to sales of securities by affiliates of an issuer, Esposito and Pignatello caused Cannabiz, through Gondolfe, to issue three additional convertible notes to Lionshare in 2014.  Each of these convertible notes was backdated to 2012. These notes increased Esposito's control of Cannabiz while the misleading backdating of the documents concealed from investors and financial intermediaries that the securities at issue were subject to the one-year holding period for securities held by affiliates of an issuer.

46.     In or about August 2014, Esposito and Pignatello instructed Gondolfe to sign three convertible promissory notes, purportedly issued in 2012, by Lion Gold to Lionshare ("LGBI Notes").  Each of the LGBI Notes was dated in 2012, and Gondolfe, on behalf of Lion Gold, signed each of the LGBI Notes.  Esposito, Pignatello and Gondolfe knew, or were reckless in not knowing, that the LGBI Notes were backdated.  Pignatello submitted copies of the backdated LGBI Notes to OTC Markets.

47.     On or before August 18, 2014, Esposito, Lionshare, Gondolfe, and Cannabiz provided documents to Cannabiz's transfer agent requesting and authorizing the transfer agent to convert the three backdated LGBI Notes into more than 8.1 million shares of Cannabiz common stock, without restrictive legends, and to issue the certificates to Lionshare.

48.     The documents Esposito, Lionshare, Gondolfe, and Cannabiz submitted to the transfer agent in order to induce the transfer agent to issue shares without restrictive legends contained various misrepresentations and false statements.  Such false and misleading documents included:

- July and August 2014 Cannabiz Board of Directors resolutions, signed by Gondolfe as President and Chairman, which falsely represented that the LGBI Notes had been created in 2012; and

- Attorney legal opinion letters dated August 2014 falsely stating that the Rule 144 one-year holding period had expired and that Lionshare was not an affiliate of Cannabiz.

These false and misleading documents induced the transfer agent to issue Cannabiz stock certificates without restrictive legends, thereby facilitating the unregistered sale of these securities into the public market.

49.     Esposito, Lionshare, Gondolfe, and Cannabiz knew, or were reckless in not knowing, that these statements were false because they knew that (1) Gondolfe was not employed by Cannabiz

in 2012 and (2) Esposito and Lionshare controlled Cannabiz and were therefore affiliates of the company.

50.     Between August 12, 2014 and September 22, 2014, Cannabiz's transfer agent issued to Lionshare 8.1 million shares of Cannabiz stock certificates without restrictive legends.  Esposito requested that the transfer agent transfer 1.3 million of these shares from Lionshare to Esposito personally, more than 800,000 shares to Pignatello, and 1 million shares to Renee Galizio, all without restrictive legends.  Esposito and Pignatello did not pay for their shares.  Galizio paid $5,000 for her shares.  Esposito requested that the transfer agent transfer the remaining 5 million shares to ten Lionshare investors.

51.     Between September 2, 2014 and September 24, 2014, Esposito, Galizio and Pignatello deposited all of their Cannabiz shares at the same brokerage firm.  Each also provided to the brokerage firm fraudulent documents similar to those  Esposito had previously provided to the transfer agent.  These fraudulent documents misrepresented Esposito and Lionshare's non-affiliate status.

52.     Esposito and Pignatello knew, or were reckless in not knowing, that their intended stock sales would be stymied if Esposito and Lionshare were publicly identified as controlling Cannabiz.

###     G.     Esposito Initiates a Stock Promotion to Increase
###     the Price and Trading Volume of Cannabiz Stock

53.      Esposito arranged for a stock promotion company to send out at least 13 email blasts to potential investors touting Cannabiz stock on October 28 and 29, 2014.

54.     The promotional campaign was designed to increase Cannabiz's stock price and trading volume. The promotional emails stated:

LGBI [the stock ticker symbol for Cannabiz] is poised for explosive growth and the play has indeed started to show what is possible.  Since March of this year more than 2500% has been added to lower valuations . . . .

55.     Cannabiz's stock price and trading volume increased dramatically as a result of the promotional efforts.  During the week prior to the promotional campaign, Cannabiz's trading volume averaged less than 10,000 shares (i.e. $500.00) traded per day.  As a result of the email blast, however, Cannabiz's stock price increased approximately 80%, from $0.05 on October 28, 2014 to a high of $0.09 on October 29, 2014, and its trading volume increased to approximately 2 million shares traded per day at the end of October.

### H.     Esposito, Pignatello, and Galizio Sell Unregistered Securities in Violation of SEC Statutes and Rules

56.     At or about the same time as the stock promotion discussed above, Esposito, Pignatello, and Galizio sold shares of Cannabiz into the market, in violation of legal prohibitions on such sales based on Esposito and Lionshare's affiliate status.

57.     Between October 28 and 31, 2014, Galizio sold her 1 million shares of Cannabiz stock for $73,009, and Pignatello sold 713,224 of his shares for $37,264.

58.     Prior to the promotion campaign, Esposito sold 113,142 shares for $7,652.  On October 29, 2014, in and around the promotion period, Esposito submitted a sell order to the same brokerage firm to sell more than 204,000 shares at approximately $0.12 per share.  Before Esposito could profit from this attempted sale of shares, however, the brokerage firm suspended selling in Esposito's account, based on information suggesting that Esposito was connected to the Cannabiz promotional campaign.

59.     In an email dated October 29, 2014, Esposito falsely represented to the brokerage firm that he "DID NOT PROVIDE OR IMPLEMENT ANY MARKET AWARENESS CAMPAIGNS FOR LGBI ever."  As a result, the brokerage firm lifted the suspension on trading in

Esposito's account on November 4, 2014. Esposito sold 197,825 shares for $8,185 on November 4 and 6, 2014. Subsequently, Esposito sold 1,006,589 shares for $6,522.

### I. Esposito and Lionshare Sell Convertible Notes for Profit

60. Around the time of the stock promotion discussed above, Esposito sold a portion of the ReBuilder Notes--including some of the Family Rebuilder Notes held in Esposito's brother-in-law's name, which Esposito secretly controlled--to Buyer A and Buyer B.

61. Between October 22, 2014 and March 23, 2015, Buyer A paid Lionshare a total of $202,148 in exchange for a portion of the ReBuilder Notes.

62. On or about November 4, 2014, Buyer B paid Lionshare $101,585 in exchange for a portion of the Rebuilder Notes.

63. Based in part on Esposito's misrepresentations regarding his and Lionshare's non-affiliate status, Buyer A and Buyer B were able to convert the debt and sell hundreds of millions of Cannabiz shares into the market between October 2014 and May 2015, in violation of the restrictions imposed by the Securities Act and Rule 144.

### First Claim for Relief
### Violation of Section 17(a) of the Securities Act
### (Esposito, Pignatello, Gondolfe, Lionshare, and Cannabiz)

64. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 63 above as if set forth fully herein.

65. By engaging in the conduct described above, Defendants Esposito, Pignatello, Gondolfe, Lionshare, and Cannabiz, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of

material fact or omissions to state a material fact necessary to make the statements made not

misleading in light of the circumstances under which they were made; or (c) engaged in transactions,

practices, or courses of business which operated as a fraud or deceit upon the purchasers of such

securities.

66.     By engaging in the conduct described above, Defendants Esposito, Pignatello,

Gondolfe, Lionshare, and Cannabiz have violated, and unless enjoined will continue to violate,

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**Second Claim for Relief**
**(Violation of Section 10(b) of Exchange Act and Rule 10b-5(b))**
**(Esposito, Gondolfe, Lionshare, and Cannabiz)**

67.     The Commission repeats and incorporates by reference the allegations in paragraphs

1 through 63 above as if set forth fully herein.

68.     By engaging in the conduct described above, Defendants Esposito, Gondolfe,

Lionshare, and Cannabiz, directly or indirectly, acting intentionally, knowingly or recklessly, in

connection with the purchase or sale of securities, by use of the means or instrumentalities of

interstate commerce or the facilities of a national securities exchange or the mails, made untrue

statements of material fact or omitted to state material fact(s) necessary to make the statements made

not misleading in light of the circumstances under which they were made.

69.     By engaging in the conduct described above, Defendants Esposito, Gondolfe,

Lionshare, and Cannabiz violated, and unless enjoined will continue to violate, Section 10(b) of the

Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §240.10b-5(b)].

**Third Claim for Relief**
**(Violation of Section 10(b) of Exchange Act and Rule 10b-5(a) and (c))**
**(Esposito, Pignatello, Gondolfe, Lionshare, and Cannabiz)**

70.     The Commission repeats and incorporates by reference the allegations in paragraphs

1 through 63 above as if set forth fully herein.

71.     By engaging in the conduct described above, Defendants Esposito, Pignatello,
Gondolfe, Lionshare, and Cannabiz, directly or indirectly, acting intentionally, knowingly or
recklessly, in connection with the purchase or sale of securities, by use of the means or
instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:
(a) employed devices, schemes, or artifices to defraud; or (b) engaged in transactions, acts, practices,
or courses of business which operated as a fraud or deceit upon purchasers of securities and upon
other persons.

**Fourth Claim for Relief**
**Aiding and Abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Pignatello)**

72.     Commission repeats and incorporates by reference the allegations in paragraphs 1
through 63 and 68-69 above as if set forth fully herein.

73.     Defendant Pignatello knowingly or recklessly provided substantial assistance to
Gondolfe and/or Cannabiz's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b).

74.     By engaging in the conduct described above, Pignatello aided and abetted violations
of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R.
§240.10b-5(b)].

**Fifth Claim for Relief**
**Violation of Sections 5 of the Securities Act**
**(All Defendants)**

75.     The Commission repeats and incorporates by reference the allegations in paragraphs
1 through 63 above as if set forth fully herein.

76.     Defendants Lionshare and Cannabiz have never been registered with the
Commission, nor have they ever registered or attempted to register any offering of securities under

the Securities Act or any class of securities under the Exchange Act.

77.     The Lionshare "Class 'B' Membership Interest Shares" and Cannabiz stock both constitute securities as defined by Section 2(a)(1) of the Securities Act [15 U.S.C. §77a(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. §78c(a)(10)].

78.     All Defendants directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

79.     As a result, all Defendants violated, and, unless enjoined, will continue to violate, Sections 5 of the Securities Act [15 U.S.C. §77e].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.     Enter permanent injunctions restraining Esposito, Pignatello, Gondolfe, Lionshare, and Cannabiz, and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from direct or indirect future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B.      Enter permanent injunctions restraining all Defendants, and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from future violations of Section 5 of the Securities Act [15 U.S.C. § 77e];

C.      Order that Esposito, Pignatello, and Gondolfe be prohibited from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)];

D.      Enter an order barring Defendants Esposito, Pignatello, Gondolfe, Galizio, and Lionshare from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

E.      Require all Defendants to disgorge their ill-gotten gains they received as a result of their violation of the federal securities laws, plus pre-judgment interest thereon;

F.      Require all Defendants to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] or Section 21(d)(3) of the Securities Exchange Act [15 U.S.C. § 78u(d)(3)];

G.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

H.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Dated:  May 26, 2016
        Boston Massachusetts

On behalf of the Commission,

David H. London (Mass. Bar No. 638289)
    Senior Counsel
Martin F. Healey (Mass. Bar. No. 227550)
    Regional Trial Counsel
Amy Gwiazda (Mass. Bar No. 663494)
    Assistant Regional Director
Scott R. Stanley (N.Y. Bar No. 4504601)
    Senior Counsel
J. Lauchlan Wash (Mass. Bar No.629092)
    Senior Counsel
Boston Regional Office
33 Arch Street, 24th Floor
Boston, Massachusetts 02110
(617) 573-8997 (London direct)
(617) 573-4590 (fax)
LondonD@sec.gov  (London email)