UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * * * |
| Plaintiff, | * * |
| v. | * Civil Action No. 1:16-cv-10960-ADB * |
| CHRISTOPHER R. ESPOSITO, ANTHONY JAY PIGNATELLO, JAMES GONDOLFE, RENEE GALIZIO, LIONSHARE VENTURES LLC, and CANNABIZ MOBILE, INC., | * * * * * * * |
| Defendants. | * |

## **MEMORANDUM AND ORDER**

BURROUGHS, D.J.

### I. INTRODUCTION

In May 2016, Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") filed this civil enforcement action against two corporate entities and four individuals, including Lionshare Ventures LLC ("Lionshare"). [ECF No. 1 (hereinafter the "Complaint")]. The case arises out of allegations that the defendants schemed to offer or sell unregistered securities in violation of federal securities laws and regulations. Currently before the Court is the SEC's Motion for a Default Judgment against Lionshare [ECF No. 69], which is supported by a Memorandum of Law [ECF No. 70] and the Declarations of David H. London ("London 2nd Decl.") [ECF No. 70-1] and Mark Albers ("Albers 2nd Decl.") [ECF No. 70-2].

On May 31, 2016, the SEC served process on Lionshare. [ECF No. 5]. Lionshare did not file an answer or motion within the required time period, which prompted this Court to order Lionshare to show cause as to why the Court should not instruct the Clerk to enter a default

against it. [ECF No. 20]. On August 1, 2016, Lionshare requested additional time to retain counsel and respond to the Commission's Complaint or to begin settlement negotiations. [ECF No. 31]. The Court granted Lionshare's request and ordered it to file a status report by September 2, 2016. [ECF No. 35]. Lionshare filed its Answer on September 1, 2016. [ECF No. 43]. The Answer was signed by Defendant Christopher R. Esposito ("Esposito") as Managing Director of Lionshare. Id.

On September 7, 2016, the Commission moved to strike Lionshare's Answer pursuant to Local Rule 83.5.5(c), which precludes corporations and limited liability companies from proceeding *pro se*. [ECF No. 44]. The Court set a hearing on the motion to strike for October 18, 2016. [ECF No. 46]. Neither Esposito nor counsel for Lionshare appeared at the hearing. [ECF No. 48]. As Lionshare failed to file an amended answer, the Court granted the motion to strike on October 19, 2016. Id. The Court then ordered Lionshare to file an amended answer by November 2, 2016. [ECF No. 49]. On January 18, 2017, the Commission moved for entry of default against Lionshare. [ECF No. 60]. Finding that Lionshare had failed to file an amended answer, the Court granted the motion and directed the Clerk to enter a default against Lionshare on January 31, 2017. [ECF No. 65].

For the reasons set forth below, the SEC's Motion for Default Judgment against Lionshare [ECF No. 69] is GRANTED.

**II. LEGAL STANDARD**

As set forth in Fed. R. Civ. P. 55(b), "a plaintiff 'must apply to the court for a default judgment' where the amount of damages claimed is not a sum certain." Vazquez-Baldonado v. Domenech, 792 F. Supp. 2d 218, 221 (D.P.R. 2011) (quoting Fed. R. Civ. P. 55(b)). As to the defendant's liability, the entry of default "constitutes an admission of all facts well-pleaded in

the complaint." Id. (internal quotations and citations omitted). Because Lionshare has defaulted in this case, it is "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability." In re The Home Restaurants, Inc., 285 F.3d 111, 114 (1st Cir. 2002) (quoting Franco v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999)). On a motion for a default judgment, however, it is appropriate to independently "examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002) (citing Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15, 16 (1st Cir. 1992)). Allegations that support a viable cause of action will establish the defendant's liability. See Fed. R. Civ. P. 55(b).

With regard to damages, Fed. R. Civ. P. 55(b)(2) provides that the court "may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." A hearing, however, is not necessarily required, particularly where the pleadings and the moving party's affidavits establish the amount of the default judgment. See In re The Home Restaurants, Inc., 285 F.3d at 114–15 (holding that district court did not abuse its discretion by entering default judgment without first holding evidentiary hearing, where there was "no uncertainty about the amounts at issue," the pleadings contained "specific dollar figures," and the court requested and received affidavits in support of the default judgment).

### III. DISCUSSION

The SEC argues that the facts alleged in its Complaint establish that the defaulting defendant violated federal securities laws by selling and offering to sell unregistered securities in interstate commerce. The SEC further argues that these facts entitle it to a permanent injunction

3

against Lionshare enjoining it from further violating federal securities laws and regulations, disgorgement of Lionshare's ill-gotten gains with prejudgment interest, and a civil monetary penalty against Lionshare.

### A. Summary of Relevant Facts

The salient facts alleged in the Complaint are summarized below. The Court accepts the well-pleaded facts as true for purposes of this Memorandum and Order. See Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 76 (1st Cir. 2001) (noting the "entry of default prevents the defendant from disputing the truth of well-pleaded facts in the complaint pertaining to liability").

#### i. Relevant Defendants

Esposito is the Managing Director of Lionshare, a privately-held corporation with its principal place of business in Danvers, MA. Compl. ¶¶ 10, 14; London 2nd Decl., Ex. A at 19 [ECF No. 42 (hereinafter "Esposito Ans.") at ¶ 10]. Lionshare is purportedly a business incubator for microcap companies (a microcap company is a business with a market capitalization of $50 million to $300 million). Compl. ¶ 14. Lionshare's securities have never been registered with the Commission, and it has never registered any securities offerings with the Commission. Id. On August 19, 2015, Esposito was subpoenaed to testify as part of the Commission's investigation that resulted in the filing of this civil action. London 2nd Decl. ¶ 2. Esposito asserted his Fifth Amendment privilege against self-incrimination as to almost every question asked of him. Id.; see generally London 2nd Decl., Ex. A.

Cannabiz Mobile, Inc. ("Cannabiz") is a corporation purportedly based in Cambridge, MA, but in reality operated out of office space it shares with Lionshare. Compl. ¶ 15; [ECF No. 40-1 (hereinafter "London Decl."), Ex. A at 34]. Cannabiz initially claimed to be in the business of mineral exploration in Brazil, and, later, the business of servicing businesses in the medical

marijuana industry. Compl. ¶ 15. Before adopting its current name of Cannabiz, it operated as ReBuilder Medical Technologies, Inc. from March 2007 to August 2012 and as Lion Gold Brazil, Inc. from August 2012 to May 2014. Id. Cannabiz's stock is not registered with the SEC, and it has not registered any securities offerings with the SEC. Id. Since at least March 2007, however, Cannabiz (and its predecessors) has been quoted and publicly traded on the Over-the-Counter ("OTC") securities markets ("OTC Markets"). Id.

    ii.  Allegations

The SEC alleges that, between June 2011 and June 2012, Esposito and Lionshare raised $556,452 from 24 investors through an offering of Lionshare Class "B" Membership Interest Shares ("Membership Interest Shares"). Compl. ¶¶ 2, 16; Esposito Ans. ¶¶ 2, 16; Albers 2nd Decl. ¶ 7. The Membership Interest Shares were sold in "units," each of which entitled investors to 200,000 shares of Lionshare membership interest, or 1% equity ownership, in Lionshare. Compl. ¶ 16. Neither Esposito nor Lionshare filed a registration statement for the offering with the Commission. Compl. ¶ 17; Esposito Ans. ¶ 2. While certain offerings are exempt from registration, Esposito and Lionshare did not satisfy any of the exemptions contained in the securities laws. Compl. ¶ 18. In addition, Esposito and Lionshare conducted a general solicitation that included cold-calling unaccredited and unsophisticated investors and then failed to provide audited financial statements to investors who did not meet the "accredited investor" definition of Rule 501(A) of Securities Act Regulation D. Compl. ¶ 18; London 2nd Decl., Ex. A at 39.

In Lionshare's private placement memorandum ("PPM"), Esposito and Lionshare represented to investors and potential investors that the proceeds of the Membership Interest Shares offering would be used to acquire an OTC public company to be named Lion Gold. Compl. ¶ 19. Lion Gold would, in turn, acquire mineral interests and mining operations. Id. After

5

the acquisition of Lion Gold, Lionshare investors would receive one share of Lion Gold common stock for each Membership Interest Share they held. Id.

The PPM stated that the Lionshare investor funds would be used for "business acquisition costs (50%)," "promotion & marketing (25%)," "operations, salaries and administrative (12.5%)," "regulatory fees, filings and legal expenses (7.5%)," "working capital (4%)," and "offering expense (1%)." Id. ¶ 20. Contrary to these representations, Esposito spent over $290,500 of the investor funds for unauthorized personal and business expenses. Id. ¶ 21. In addition, between August 2011 and November 2012, approximately $153,000 of investor funds were used to form Lion Mineracao Ltda. ("Lion Mineracao"), a private Brazilian corporation, for the stated purpose of mining in Brazil. Id. ¶ 22. Although investor funds were used to fund Lion Mineracao, Esposito owned 99.99% of the company while Lionshare investors owned nothing.[1] Id.; London 2nd Decl., Ex. A at 32–33, 43–44, 46, 56–58.

In late May 2012, Esposito used approximately $75,000 of Lionshare investor funds to purchase five convertible promissory notes collectively amounting to $711,238, which represented all of the outstanding debt obligations of Cannabiz (then known as ReBuilder). Compl. ¶ 23. The notes gave Esposito (through Lionshare) effective control over Cannabiz because they were convertible at any time into 711,238,000 shares of Cannabiz's common stock (almost 18 times the amount of outstanding shares). Id. ¶ 24. On May 29, 2012, Esposito assigned one Cannabiz note to Lionshare. Id. The note was convertible to approximately 83 million shares of Cannabiz. Id. The other four Cannabiz notes were assigned to Esposito's brother-in-law. Id.

---

[1] The remaining 0.01% of Lion Mineracao was owned by R.A., an individual residing in Brazil whom Esposito hired to be his sole representative in Brazil. Compl. ¶ 22.

Even though Esposito had no official position with Cannabiz, he (through Lionshare and his brother-in-law) secretly controlled and funded the company. Id. ¶ 26; London Decl., Ex. A, at 56, 74–76, 172, 174; London Decl., Ex. B ("Chris [Esposito] is among the largest debt holders of [Cannabiz] and can sink [it] at any time, as we have no access to capital and are asking Chris to fund the company."). By virtue of their control over Cannabiz, Esposito and Lionshare were "affiliates" of the company. See 17 C.F.R. § 230.144(a)(1) (defining a company's "affiliate" as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" the company).

Esposito and Lionshare, however, concealed their affiliate status in order to profit from prohibited transactions, such as inducing Cannabiz's transfer agent to issue to Esposito and others millions of Cannabiz common shares without a restrictive legend. Compl. ¶¶ 27, 28; London Decl., Ex. A at 199–200. Without a restrictive legend, these shares could be sold into the public market despite Esposito and Cannabiz's having failed to comply with the applicable laws regulating sales of shares owned or controlled by affiliates. Compl. ¶ 29. By hiding their affiliate status and inducing the issuance of unlegended common shares, Esposito and Lionshare contravened an SEC rule prohibiting sales of securities received from an affiliate prior to the completion of a one-year holding period. 17 C.F.R. § 230.144(d)(1)(ii).

Moreover, Esposito provided various fraudulent and misleading documents to the transfer agent, which stated that Lionshare was not an affiliate of Cannabiz (by August 2012, Cannabiz was known not as ReBuilder, but as Lion Gold) and that the to-be-issued ReBuilder common shares were "free trading common stock" unburdened by "restrictive legend or transfer restrictions." Compl. ¶ 29. On July 27, 2012, based on Esposito's misrepresentations about his and Lionshare's affiliate status, the transfer agent issued 47 stock certificates without restrictive

7

legends, representing 18,236,000 shares of ReBuilder common stock, at least 3,675,000 of which went to Esposito personally. Id. ¶ 31.

On or around October 8, 2012, Esposito directed the transfer agent to issue additional stock certificates without restrictive legends in order to transfer 3.3 million of his personal shares to various investor relations "consultants" as payment for their blasts of promotional emails to potential investors. Id. ¶ 32. The consultants sold 2,396,000 of their shares to the public, gaining a profit of $62,835; and Esposito personally sold 94,500 shares to the public, gaining $1,950. Id. ¶ 33. All of this occurred before the expiration of the required one-year holding period. Id.; 17 C.F.R. § 230.144(d)(1)(ii).

On November 16, 2012 and January 8, 2013, Esposito caused Cannabiz (then known as Lion Gold) to submit information statements, which falsely represented that Lion Mineracao was Lion Gold's wholly-owned operating subsidiary, to OTC Markets for public disclosure. Id. ¶¶ 35, 37. In reality, Esposito owned 99.99% of Lion Mineracao, while Cannabiz had no ownership stake. Id. The information statements also failed to disclose (i) Esposito and Lionshare's control over Cannabiz through the convertible promissory notes and (ii) the dilution of shareholder equity that would result if Esposito and Lionshare converted this debt into common stock. Id. ¶ 36. These misrepresentations and omissions left Cannabiz's investors unaware of Esposito's control over Cannabiz, his ownership of all its purported mineral assets, and his ability—at any time—to significantly dilute existing shareholders' ownership interest in Cannabiz by converting debt into equity. Id.

On or about April 3, 2014, Esposito installed James Gondolfe ("Gondolfe") as Cannabiz's President, CEO, Chairman, and sole director. Id. ¶ 39; London Decl., Ex. A, at 31, 132, 168–69. At this time, Cannabiz was still known as Lion Gold. Id. Gondolfe acted solely at

8

Esposito's direction; for example, he unquestioningly signed false and misleading Cannabiz documents that Esposito and others placed in front of him. Compl. ¶ 39; London Decl., Ex. A at 59, 111–12, 121–22, 127–28, 135–40, 152–53, 157–60, 165–68, 171, 177–81, 188–90, 213–14. Esposito used documents bearing Gondolfe's signature to induce Lion Gold's transfer agent to issue millions of unlegended shares, which facilitated the sale of those unregistered shares to the public. Compl. ¶¶ 48, 50. 8.1 million of these shares went to Lionshare, who then sold them to 11 investors for a profit of $120,575. Id. ¶ 50; Albers 2nd Decl. ¶ 8.

In June 2014, Cannabiz (then known as Lion Gold) issued a press release announcing that its name had changed to Cannabiz and that it had altered its business purpose from mining minerals in Brazil to mobile media and marketing focused on the medical marijuana industry. Compl. ¶ 44. In August 2014, in order to create more convertible debt to sell for a profit, Esposito caused Cannabiz to issue three additional convertible notes to Lionshare. Id. ¶¶ 45–47. He backdated these notes to appear as though they had been issued in 2012, thereby concealing from investors and financial intermediaries that the securities in question had not satisfied Rule 144's one-year holding period for securities held by an issuer's affiliates. Id.; 17 C.F.R. § 230.144(d)(1)(ii). Gondolfe, again following Esposito's direction, signed all three backdated notes, which were submitted to OTC Markets for publication. Id. ¶ 46; London Decl., Ex. A, at 158–60.

Esposito, Lionshare, Gondolfe, and Cannabiz then provided documents containing misrepresentations and false statements to Cannabiz's transfer agent in order to induce the transfer agent to convert the three backdated notes into more than 8.1 million shares of Cannabiz stock certificates without restrictive legends, thereby facilitating the unregistered sales of these securities into the public market. Compl. ¶¶ 47–48. These documents included Cannabiz Board

9

of Directors resolutions, signed by Gondolfe, which falsely represented that the notes had been created in 2012 and that Lionshare was not an affiliate of Cannabiz. Id. ¶ 48. Esposito, Lionshare, Gondolfe, and Cannabiz knew, or were reckless in not knowing, that the documents Gondolfe had signed contained false statements because (1) Gondolfe was not even employed by Cannabiz in 2012 (the date that appears on the backdated notes he had signed) and (2) Esposito and Lionshare controlled Cannabiz (and were therefore its affiliates). Id. ¶ 49. As a result, Cannabiz's transfer agent issued more stock certificates without restrictive legends, thereby facilitating the sale of Cannabiz shares to the public markets notwithstanding the defendants' misrepresentation and concealment of the Rule 144 restrictions on the sale of the shares based on Esposito and Lionshare's undisclosed affiliate status. Id. ¶¶ 50–52.

Esposito then arranged for a stock promotion company to send out at least 13 email blasts on October 28 and 29, 2014 that touted Cannabiz's stock to potential investors. Id. ¶ 53. These blasts were designed to increase Cannabiz's stock price and trading volume. Id. ¶¶ 53–54. The blasts successfully raised Cannabiz's stock price and trading volume, allowing Esposito and other defendants to sell their Cannabiz shares in the public market for a profit in violation of Rule 144's prohibitions on such sales by affiliates. Id. ¶¶ 55–59; 17 C.F.R. § 230.144(d)(1)(ii). Esposito and Lionshare also sold some of Cannabiz's convertible debt to two purchasers for a total of over $303,000. Id. ¶¶ 60–62. Based on Esposito's misrepresentations regarding his and Lionshare's affiliate status, the two purchasers later converted the debt and sold hundreds of millions of Cannabiz shares into the public market between October 2014 and May 2015, again in violation of Rule 144's restrictions. Id. ¶ 63; 17 C.F.R. § 230.144(d)(1)(ii).

### B.     Discussion of Liability

####         i.     Liability under Section 5 of the Securities Act

The Complaint's Fifth Claim for Relief alleges that Lionshare violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"). 15 U.S.C. § 77e(a), (c). Section 5(a) makes it unlawful for anyone to sell, directly or indirectly, securities through the use of any means or instruments of interstate commerce without an effective registration statement. 15 U.S.C. § 77e(a). Section 5(c) similarly prohibits offers to buy or sell securities unless a registration statement has been filed. 15 U.S.C. § 77e(c).

A *prima facie* case for a violation of Sections 5(a) and 5(c) requires a showing that: (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell or sold the securities; and (3) the offer or sale was made in connection with the use of interstate transportation, communication, or the mails. See SEC v. Spence & Green Chem. Co., 612 F.2d 896, 901–02 (5th Cir. 1980).

After reviewing the facts alleged in the Complaint, the Court finds that they sufficiently support the claims alleged in the SEC's Fifth Claim for Relief. First, the Complaint alleges that Lionshare engaged in the sale or offering of "securities," as that term is defined in the Securities Act and the Exchange Act of 1934 ("Exchange Act"). 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). Compl. ¶ 77. The Complaint also alleges that Lionshare directly engaged in these unregistered sales and offerings of securities, in violation of Section 5(a) and 5(c) of the Securities Act. Id. ¶ 78. In the first sale or offering, between June 2011 and June 2012, Lionshare raised $556,452 from 24 investors by offering Lionshare Membership Interest Shares. Compl. ¶¶ 2, 16; Esposito Ans. ¶¶ 2, 16; Albers 2nd Decl. ¶ 7. In the second sale or offering, between April 2014 and September 2014, Lionshare raised $120,575 from 11 investors through the sale of

Cannabiz stock certificates without a restrictive legend. Compl. ¶ 50; Albers 2nd Decl. ¶ 8. In the third and final sale or offering, between October 2014 and April 2015, Lionshare raised a total of $303,734 from two investors through the sale of a portion of Cannabiz convertible debt. Compl. ¶¶ 61–62; Albers 2nd Decl. ¶ 9. In total, Lionshare received $980,761 in ill-gotten gains. Finally, the Complaint adequately alleges that these sales and offerings were made in connection with the use of interstate transportation, communication, or the mails. Compl. ¶ 78. Thus, the SEC has made a *prima facie* showing that Lionshare violated Sections 5(a) and 5(c) of the Securities Act.

Once the SEC pleads a *prima facie* violation of Section 5, the defendant bears the burden of proving that the securities or the transactions qualified for an exemption from registration. See SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953). Because Lionshare has defaulted, it has not rebutted the SEC's *prima facie* showing. Therefore, the SEC has sufficiently demonstrated Lionshare's Section 5 liability.

        ii.    <u>Liability under Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b)</u>

The Complaint's First and Second Claims for Relief allege that Lionshare violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b). Section 17(a) of the Securities Act prohibits, in the offer or sale of securities: (1) devices, schemes, or artifices to defraud; (2) obtaining money or property by means of materially false or misleading statements or omissions; and (3) transactions, practices, or courses of business that operate as a fraud or deceit. 15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made not misleading; or (3) engaging in any transaction, practice, or course

of business that operates or would operate as a fraud or deceit upon any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; see also SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (quoting Rule 10b-5). In a civil enforcement action brought by the SEC itself, the SEC need not prove any investor's actual reliance on the misrepresentations. See Tambone, 597 F.3d at 447 n.9. Lastly, violations of Sections 17(a)(1) and 10(b) and Rule 10b-5 require proof of scienter, but claims based on Sections 17(a)(2) and 17(a)(3) do not. See Aaron v. SEC, 446 U.S. 680, 701–02 (1980) ("the Commission is required to establish scienter as an element of a civil enforcement action to enjoin violations of § 17(a)(1) of the 1933 Act, § 10(b) of the 1934 Act, and Rule 10b-5 . . . [but] need not establish scienter as an element of an action to enjoin violations of § 17(a)(2) and § 17(a)(3) of the 1933 Act.").

Section 10(b) and Rule 10b-5(b) thereunder prohibit "mak[ing] any untrue statement of a material fact in connection with the purchase or sale of securities." Janus Cap. Grp. v. First Derivative Traders, 564 U.S. 135, 141 (2011) (quoting Rule 10b-5). The Complaint alleges that Lionshare made misrepresentations and omissions to investors in the PPM. Compl. ¶ 19. The PPM specifically represented to investors that the proceeds of the Lionshare offering of Membership Interest Shares would be used to acquire Lion Gold, which would be used to acquire mineral interests and mining operations. Id. Once the acquisition of Lion Gold was complete, the Lionshare investors were to receive one share of Lion Gold common stock for each Membership Interest Share they held. Id. The PPM went on to provide a breakdown of how the investor funds would be used. Id. ¶ 20. Contrary to these representations, however, over $290,500 of the investor funds were used by Esposito for unauthorized personal and business expenses. Id. ¶ 21. In addition, between August 2011 and November 2012, approximately $153,000 of investor funds were used to form Lion Mineracao. Id. ¶ 22. Despite the fact that

investor funds were used to fund Lion Mineracao, Esposito owned 99.99% of the company while Lionshare investors owned nothing. Id.; London 2nd Decl., Ex. A at 32–33, 43–44, 46, 56–58.

Section 17(a)(2) prohibits obtaining money or property by means of materially false or misleading statements or omissions in the offer or sale of securities. 15 U.S.C. § 77q(a)(2). In addition to the misrepresentations discussed above, which resulted in Lionshare raising at least $556,452, Compl. ¶ 16, the Complaint alleges that Lionshare also obtained money through the use of numerous misstatements submitted to Cannabiz's transfer agent, which induced the issuance of millions of shares of common stock without the restrictive legend, id. ¶¶ 48–50.

The SEC has also adequately alleged that these misstatements were material. Id. ¶ 65. A fact is material if a reasonable investor would view disclosure of the fact "as having significantly altered the total mix of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231–232 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). The misstatements contained in the PPM were material because they influenced Lionshare investors to invest in the unregistered offering of Membership Interest Shares under the belief that their money would be used to purchase Lion Gold, which would then be used to acquire mineral interests and mining operations, Compl. ¶¶ 16–21, although the reality was that Esposito "planned to use the money for his own purposes," see SEC v. Zada, 787 F.3d 375, 382 (6th Cir. 2015) (finding materiality where investors were told their money would be used to buy oil, "when in fact [the defendant] planned to use the money for his own purposes").

With respect to the misstatements and omissions regarding Lionshare's status as an affiliate of Cannabiz, these misstatements and omissions were material because they influenced Cannabiz's transfer agent to issue stock certificates without the restriction that would have prohibited their sale prior to the expiration of the Rule 144 one-year holding period. Compl. ¶ 30.

14

Consequently, hundreds of millions of Cannabiz shares were sold to the investing public despite legal prohibitions on those sales. Id. ¶ 63; see Joyce v. Joyce Beverages, Inc., 571 F.2d 703, 707 (2d Cir. 1978) (finding a "statement about the potential availability of Rule 144 could have misled the reasonable shareholder into thinking that [Rule 144] was, in fact, available to him").

The SEC also sufficiently alleges that Lionshare acted with the scienter required for § 17(a)(1) and § 10(b) liability (but not required for § 17(a)(2) or § 17(a)(3) liability). See Aaron, 446 U.S. at 701–02. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). It may be proven by indirect evidence and may include extreme recklessness. See In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002). Recklessness involves "an extreme departure from the standards of ordinary care [that] presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999) (internal citation omitted). Esposito's scienter can be imputed to Lionshare. See SEC v. Manor Nursing, 458 F.2d 1082, 1096 n.17 (2d Cir. 1972) (an individual's "knowledge is imputed to the corporations which he controlled").

Here, the Complaint alleges Esposito misappropriated Lionshare investor funds for unauthorized personal purposes. Compl. ¶ 21. The Complaint further alleges that Esposito actively hid his and Lionshare's status as an affiliate of Cannabiz to induce Cannabiz's transfer agent to issue stock certificates without the restriction that would have prohibited their sale prior to the expiration of the one-year holding period, which caused hundreds of millions of Cannabiz shares to be sold to the public despite the legal prohibition on their sale. Compl. ¶¶ 30, 63. Finally, the Complaint alleges that Esposito instructed Gondolfe to issue three backdated notes to Lionshare, which were then submitted to OTC Markets for publication. Id. ¶¶ 45–47; London

15

Decl., Ex. A at 158–60.

Thus, the SEC has adequately established Lionshare's liability under § 17(a)(2), § 10b, and Rule 10b-5(b).

        iii.    Scheme Liability under § 17(a)(1), (a)(3) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5(a), (c)

The SEC next alleges that Lionshare employed schemes that violated § 17(a)(1) and § 17(a)(3) of the Securities Act and § 10(b) of the Exchange Act and Rule 10b-5(a), (c) thereunder (First and Third Claims for Relief). Scheme liability arises where the defendants employ a deceptive device for the purpose of defrauding investors. See SEC v. Durgarian, 477 F. Supp. 2d 342, 351–52 (D. Mass 2007).

Here, Esposito and Lionshare conducted a brazen scheme to misuse investor money and to create the deceptive appearance that Cannabiz securities were not subject to trading restrictions. They directly or indirectly fabricated corporate documents and regulatory filings, and submitted them to the transfer agent, along with false attorney opinion letters, as part of the scheme to induce the transfer agent to issue hundreds of millions of purportedly unrestricted Cannabiz shares that were ultimately sold to the investing public despite the trading prohibitions on their sale. Compl. ¶¶ 45–48, 63. Moreover, as stated above, the SEC has adequately alleged that Lionshare acted with scienter, an element required by § 17(a)(1) and § 10(b) (but not required for § 17(a)(3) liability). See Aaron, 446 U.S. at 701–02.

Because the SEC's Complaint adequately alleges that Lionshare had engaged in a scheme to defraud with scienter, the Court finds that the SEC has properly shown Lionshare's liability under § 17(a)(1), § 17(a)(3), and Rule 10b-5(a), (c).

## IV. RELIEF

### A. Disgorgement

In light of Lionshare's default, the SEC has requested that the Court enter an Order of Disgorgement and Prejudgment Interest. [ECF No. 69]. In a case involving violations of the federal securities laws, the Court has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. Druffner, 802 F. Supp. 2d 293, 297 (D. Mass. 2011) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474–75 (2d Cir. 1996)). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004) (internal quotations and citation omitted).

After reviewing the Second Declaration of Mark Albers [ECF 70-2], the SEC's forensic accountant, the Court finds that the disgorgement amount requested by the SEC reasonably approximates profits causally connected to the illegal conduct alleged in the Complaint. In order to estimate the appropriate disgorgement figure in this case, Albers reviewed bank records and other documents produced to the SEC, and concluded that Lionshare received $980,761 in ill-gotten gains. Albers 2nd Decl. ¶¶ 6–9. He then calculated, based on those figures and the interest rate used by the Internal Revenue Service (IRS) in charging interest on tax underpayments, that $126,652 of prejudgment interest has accrued. Id. ¶¶ 10–11. The Court finds no error in Mr. Albers' calculations, which represent a reasonable approximation of profits causally connected to Lionshare's violations.

Prejudgment interest on disgorged profits is also appropriate in order to prevent "defendants from enjoying an interest-free loan on their illicitly-obtained gains." SEC v. Levine,

17

517 F. Supp. 2d 121, 141 (D.D.C. 2007) (citing SEC v. Kenton Cap., Ltd., 69 F. Supp. 2d 1, 16–17 (D.D.C. 1998)). The SEC's proposal to use the IRS's interest rate on tax underpayments is appropriate because it reasonably approximates the unjust benefit of the use of ill-gotten money. See First Jersey, 101 F.3d at 1475–76.

Therefore, the Court will order Lionshare to disgorge a total of $1,107,413 (its ill-gotten gains plus prejudgment interest).

### B. Civil Penalties

The SEC further argues that the Court should impose civil penalties upon the defaulting defendant, Lionshare, pursuant to § 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and § 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). Those statutes authorize the Court to determine the amount of the penalty "in light of the facts and circumstances." 15 U.S.C. §§ 78u(d)(3)(B)(i), 77t(d)(2)(A); see SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) ("The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."). "Both statutes provide three tiers of penalties, the amount increasing with the severity of the violation." SEC v. Manterfield, No. CIV A 07-10712-RGS, 2009 WL 935953, at *1 (D. Mass. Apr. 8, 2009). The "Tier I penalties are generally applicable . . . . Tier II penalties require 'fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement,' . . . and Tier III penalties require the Tier II elements plus 'substantial losses or . . . significant risk of substantial losses to other persons.'" Kern, 425 F.3d at 153 (quoting 15 U.S.C. § 77t(d)(2)) (internal citations omitted).

"Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." SEC v. Monterosso, 756 F.3d 1326, 1338 (11th Cir. 2014) (citing SEC v. Sargent, 329 F.3d 34, 41 n.2 (1st Cir. 2003)). In determining the

appropriate fine, courts have considered factors including the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation or lack thereof with authorities, and the defendant's current financial condition. See, e.g., SEC v. Converge Glob., Inc., No. 04-80841CV, 2006 WL 907567, at *6 (S.D. Fla. Mar. 10, 2006); SEC v. Cavanagh, No. 98-1818DLC, 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004).

Here, the SEC requests that the Court impose a Tier III (third-tier) penalty of $775,000 against Lionshare, ECF No. 70 at 18–19, which is the maximum third-tier penalty in effect from December 10, 1996 through November 2, 2015. See 17 C.F.R. § Pt. 201, Subpt. E, Tbl. I (increasing maximum Tier-III penalty to account for inflation adjustments). All of the conduct giving rise to liability for the defendants in this case occurred before May 2015.

The Court finds that, based on the allegations in the SEC's Complaint, a third-tier penalty against Lionshare is warranted. Lionshare was instrumental in an illicit scheme to evade the securities laws' registration requirements. Lionshare, through Esposito, acted with scienter in misappropriating investor funds for Esposito's unauthorized personal use, Compl. ¶ 21, actively hiding its status as an affiliate of Cannabiz in order to induce Cannabiz's transfer agent to issue unrestricted stock certificates, Id. ¶¶ 30, 63, and in instructing Gondolfe to issue three backdated notes to Lionshare, which were then submitted to OTC Markets for publication, Id. ¶¶ 45–47; London Decl., Ex. A at 158–60.

Lionshare's actions caused investors to suffer substantial losses when the Cannabiz shares they had bought became worthless after the conversion of Cannabiz debt and the dumping of millions of Cannabiz shares into the public markets. Private investors who purchased Cannabiz's convertible debt also sustained losses. In addition, Lionshare has not accepted

responsibility for its actions—having defaulted and failed to appear before this Court to defend or explain its conduct. The Court, therefore, imposes a third-tier civil penalty on Lionshare of $775,000. See 17 C.F.R. § 201.1001 and Table I.

### C. Permanent Injunction

The SEC has also requested that the Court enter a permanent injunction enjoining Lionshare from committing further violations of the federal securities laws. See 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future." SEC v. Druffner, 517 F. Supp. 2d 502, 513 (D. Mass 2007) (citation omitted). To determine whether the defendant is reasonably likely to violate the laws again in the future, the Court looks to "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." Id. (quoting SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994)). In light of the allegations in the Complaint, which describe an elaborate and deliberate scheme to defraud investors, the Court finds that a permanent injunction enjoining Lionshare from committing further violations of the federal securities law is warranted.

## V. CONCLUSION

For the foregoing reasons, the SEC's Motion for Default Judgment against Lionshare [ECF No. 69] is GRANTED.

**SO ORDERED.**

Dated: April 14, 2017

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE