UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 16-cv-10960-ADB |
| CHRISTOPHER R. ESPOSITO, et al., | * * | |
| Defendants. | * * | |

**MEMORANDUM AND ORDER ON MOTION FOR DEFAULT JUDGMENT**

BURROUGHS, D.J.

In May 2016, Plaintiff Securities and Exchange Commission ("SEC") filed this civil enforcement action against two corporate entities and four individuals, including Christopher R. Esposito. [ECF No. 1] ("Complaint"). The case arises out of allegations that the defendants schemed to offer or sell securities without registration or exemption in violation of federal securities laws and regulations. Currently pending before the Court is the SEC's motion for the entry of a default judgment against Esposito. [ECF No. 115]. For the reasons that follow, the motion is GRANTED.

I. **BACKGROUND**

On May 31, 2016, the SEC served process on Esposito. [ECF No. 6]. After being granted an extension of time to respond to the Complaint [ECF No. 12], Esposito failed to timely file a responsive pleading, which prompted the Court to order Esposito to show cause as to why the Court should not instruct the Clerk to enter a default against him. [ECF No. 20]. Acting *pro se*, Esposito filed an answer on September 1, 2016. [ECF No. 42] ("Answer").

On September 28, 2017, the SEC moved for sanctions against Esposito for failing to

attend his properly noticed deposition on September 27, 2017. [ECF No. 102]. The Court advised Esposito that it may enter a default against him if he failed to either (1) be deposed by November 3, 2017 or arrange an extension of that deadline, or (2) show cause as to why he had not done so by that date. [ECF No. 105]. Esposito failed to attend this second properly-noticed deposition and did not otherwise comply with the Court's show-cause order, prompting the entry of a default against him. [ECF Nos. 112, 113]. Esposito has not responded to the instant motion for the entry of a default judgment.

## II.    LEGAL STANDARD

As set forth in Fed. R. Civ. P. 55(b), "a plaintiff 'must apply to the court for a default judgment' where the amount of damages claimed is not a sum certain." Vazquez-Baldonado v. Domenech, 792 F. Supp. 2d 218, 221 (D.P.R. 2011) (quoting Fed. R. Civ. P. 55(b)). As to the defendant's liability, the entry of default "constitutes an admission of all facts well-pleaded in the complaint." Id. (internal quotations and citations omitted). Because Esposito defaulted in this case, he is "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability." In re The Home Restaurants, Inc., 285 F.3d 111, 114 (1st Cir. 2002) (quoting Franco v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999)). On a motion for a default judgment, however, it is appropriate to independently "examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002). Allegations that support a viable cause of action will establish the defendant's liability. See Fed. R. Civ. P. 55(b).

With regard to damages, Fed. R. Civ. P. 55(b)(2) provides that the Court "may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to (A) conduct an

accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." A hearing, however, is not required, particularly where the pleadings and the moving party's affidavits establish the amount of the default judgment. See In re The Home Restaurants, Inc., 285 F.3d at 114 (holding that district court did not abuse its discretion by entering default judgment without first holding evidentiary hearing, where there was "no uncertainty about the amounts at issue," pleadings contained "specific dollar figures," and court requested and received affidavits in support of the default judgment).

## III.    DISCUSSION

The SEC argues that the facts alleged in the Complaint establish that Esposito violated federal securities laws by selling and offering to sell unregistered securities in interstate commerce. The SEC further argues that these facts warrant (1) permanently enjoining Esposito from further violating federal securities laws and regulations, (2) imposing a third-tier civil penalty on Esposito individually, (3) holding him jointly and severally liable with Defendant Lionshare Ventures LLC ("Lionshare") for the disgorgement of ill-gotten gains with pre-judgment interest in the total amount of $1,107,413, (4) barring him from acting as an officer or director of a public company, and (5) barring him from participating in a penny stock offering.

### A.    Background

The salient facts alleged in the Complaint are summarized below. The Court accepts the well-pleaded facts as true for purposes of this Memorandum and Order. See Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 76 (1st Cir. 2001) (noting that the "entry of default prevents the defendant from disputing the truth of well-pleaded facts in the complaint pertaining to liability.").

1. <u>Relevant Defendants</u>

Esposito is the Managing Director of Lionshare, a privately-held corporation with its principal place of business in Danvers, MA. Compl. ¶¶ 10, 14; Ans. ¶ 10. Lionshare is purportedly a business incubator for "microcap companies" (businesses with a market capitalization of $50 million to $300 million). Compl. ¶ 14. Lionshare's securities have never been registered with the SEC, nor has Lionshare ever registered any securities offerings with the SEC. <u>Id.</u> On August 19, 2015, Esposito was subpoenaed to testify as part of the SEC's investigation that resulted in the filing of this action. [ECF No. 70 at 8]. Esposito asserted his privilege against self-incrimination under the Fifth Amendment of the United States Constitution in response to almost every question asked of him. <u>Id.</u>; [ECF No. 70-1 at Ex. A] ("London 2nd Decl.").

On April 14, 2017, the Court entered a final default judgment as to Lionshare. [ECF Nos. 90, 91]. The Court ordered Lionshare to pay disgorgement of $980,761, together with prejudgment interest of $126,652, for a total of $1,107,413. [ECF No. 90 at 17]. The Court also imposed a third-tier civil penalty of $775,000, entered a permanent injunction enjoining Lionshare from committing further violations of the federal securities laws, and imposed a penny stock bar in a supplemental order. [ECF Nos. 93, 94].

Defendant Cannabiz Mobile, Inc. ("Cannabiz") is a corporation purportedly based in Cambridge, MA, but actually operates out of office space that it shares with Lionshare. Compl. ¶ 15. Cannabiz initially claimed to be in the business of mineral exploration in Brazil, and, later, the business of servicing the medical marijuana industry. <u>Id.</u> Before adopting its current name of Cannabiz, it operated as ReBuilder Medical Technologies, Inc. ("ReBuilder") from March 2007 to August 2012 and as Lion Gold Brazil, Inc. ("Lion Gold") from August 2012 to May 2014. <u>Id.</u>

Cannabiz never registered any securities offerings with the SEC. Id. Since at least March 2007, however, Cannabiz has been publicly traded on the Over-the-Counter ("OTC") securities markets.[1] Id. Defendant James Gondolfe served as the Chairman and President of Cannabiz. Id. ¶ 12. Defendant Anthony Jay Pignatello was a consultant to Cannabiz and its Secretary. Id. ¶ 11. On January 27, 2017, the Court entered default judgments against Cannabiz and Gondolfe. [ECF Nos. 62, 64]. On January 8, 2018, Pignatello informed the Court that he has agreed to enter into a settlement agreement with the SEC, pending the resolution of a related criminal case. [ECF Nos. 124, 128].[2]

### 2.      Summary of Facts

Between June 2011 and June 2012, Esposito and Lionshare raised $556,452 from 24 investors through an offering of Lionshare Class "B" Membership Interest Shares. Compl. ¶¶ 2, 16; Ans. ¶¶ 2, 16; [ECF No. 70-2 at ¶ 7] ("Albers 2nd Decl."). The Membership Interest Shares were sold in "units," each of which entitled investors to 200,000 shares of membership interest, or 1% equity ownership, in Lionshare. Compl. ¶ 16. Neither Esposito nor Lionshare filed a registration statement with the SEC for the offering, and the offering did not qualify for any of the exemptions from registration under the relevant securities laws. Id. ¶¶ 17−18. In addition, Esposito and Lionshare conducted a general solicitation that included cold-calling unaccredited and unsophisticated investors and failed to provide audited financial statements to investors who did not meet the "accredited investor" definition of Rule 501(A) of Securities Act Regulation D. Id.; London 2nd Decl., Ex. A at 39. Esposito further represented to investors and potential

---

[1] OTC markets are decentralized markets that do not have physical locations where stocks are traded. Compl. ¶ 15 n.1. Buyers and sellers in the OTC Markets execute trades via telephone, email, and proprietary electronic trading systems. Id.

[2] The remaining defendant, Renee Galizio, consented to the Court's entry of a final judgment on December 11, 2017. [ECF No. 122].

investors in emails and in the Lionshare private placement memorandum ("PPM") that the proceeds of the Membership Interest Shares offering would be used to acquire an OTC public company to be named Lion Gold, which would acquire mineral interests and mining operations. Compl. ¶ 19. Lionshare investors in turn would receive one share of Lion Gold common stock for each Membership Interest Share they held. Id.

The PPM specified that a percentage of Lionshare investor proceeds would be used for "business acquisition costs (50%)," "promotion & marketing (25%)," "operations, salaries and administrative (12.5%)," "regulatory fees, filings and legal expenses (7.5%)," "working capital (4%)," and "offering expense (1%)." Id. ¶ 20. Contrary to the representations in the PPM, Esposito used over $290,500 of the investor funds for unauthorized personal and business expenses. Id. ¶ 21. Further, between August 2011 and November 2012, Esposito used approximately $153,000 of Lionshare investor funds to form Lion Mineracao Ltda. ("Lion Mineracao"), a private Brazilian corporation, for the stated purpose of mining in Brazil. Id. ¶ 22. Although Lionshare investor proceeds were used to fund Lion Mineracao, the investors had no ownership interest in the company while Esposito owned 99.99% of Lion Mineracao.[3] Id.; London 2nd Decl., Ex. A at 32–33, 43–44, 46, 56–58.

In late May 2012, Esposito used approximately $75,000 of Lionshare investor funds to purchase five convertible promissory notes totaling $711,238, which comprised all of the outstanding debt obligations of Cannabiz (then known as ReBuilder). Compl. ¶ 23. The notes gave Esposito control over Cannabiz because they were convertible at any time into 711,238,000 shares of Cannabiz's common stock (almost 18 times the amount of outstanding shares). Id. ¶ 24.

---

[3] The other .01% was owned by R.A., an individual then residing in Brazil whom Esposito hired to be his sole representative in Brazil. Compl. ¶ 22.

On May 29, 2012, Esposito assigned one of the notes to Lionshare, and assigned the remaining four notes to his brother-in-law. Id.

Even though Esposito had no official position with Cannabiz, he (through Lionshare and his brother-in-law) secretly controlled and funded the company. Id. ¶ 26. Esposito made his Brazilian representative the President, CEO, CFO, Chairman, and sole member of the Cannabiz Board of Directors, and he hired Pignatello as the Secretary of Cannabiz. Id. ¶ 25. By virtue of their control over Cannabiz, Esposito and Lionshare were "affiliates" of the company. See 17 C.F.R. § 230.144(a)(1) (defining a company's "affiliate" as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" the company). Esposito and Lionshare, however, concealed their affiliation with Cannabiz in order to profit from transactions that are prohibited under the securities laws. Compl. ¶ 27. Without a restrictive legend, these shares could be sold into the public market despite Esposito and Cannabiz having failed to comply with the applicable laws regulating sales of shares owned or controlled by affiliates. Compl. ¶ 29. By hiding their affiliate status and inducing the issuance of unlegended common shares, Esposito and Lionshare contravened an SEC rule prohibiting sales of securities received from an affiliate prior to the completion of a one-year holding period. 17 C.F.R. § 230.144(d)(1)(ii).

Moreover, Esposito provided various fraudulent and misleading documents to the Cannabiz transfer agent, which stated that Lionshare was not an affiliate of Cannabiz and that the to-be-issued Cannabiz (then known as ReBuilder) common shares were "free trading common stock" unburdened by "restrictive legend or transfer restrictions." Compl. ¶ 29. On July 27, 2012, based on Esposito's misrepresentations about his and Lionshare's affiliate status, the transfer

agent issued 47 stock certificates without restrictive legends, representing 18,236,000 shares of Cannabiz common stock, at least 3,675,000 of which went to Esposito personally. Id. ¶ 31.

On or around October 8, 2012, Esposito directed the transfer agent to issue additional stock certificates without restrictive legends in order to transfer 3.3 million of his personal shares to various investor relations "consultants" as payment for their blasts of promotional emails to potential investors. Id. ¶ 32. The consultants sold 2,396,000 of their shares to the public, gaining a profit of $62,835; and Esposito personally sold 94,500 shares to the public, gaining $1,950. Id. ¶ 33. All of this occurred before the expiration of the required one-year holding period. Id.; 17 C.F.R. § 230.144(d)(1)(ii).

On November 16, 2012 and January 8, 2013, Esposito caused Cannabiz (then known as Lion Gold) to file information statements for public disclosure to the OTC markets, which falsely represented that Lion Mineracao was Cannabiz's wholly-owned operating subsidiary. Compl. ¶¶ 35, 37. In reality, Esposito owned 99.99% of Lion Mineracao, and Cannabiz had no ownership interest. Id. The information statements also failed to disclose (i) the amount of Cannabiz convertible debt that Esposito and Lionshare controlled through the promissory notes and (ii) the dilution of shareholder equity that would result if Esposito and Lionshare converted this debt into common stock. Id. ¶ 36. These misrepresentations and omissions left Cannabiz's investors unaware of Esposito's control over Cannabiz, his ownership of all its purported mineral assets, and his ability, at any time, to significantly dilute existing shareholders' ownership interest in Cannabiz. Id.

On or about April 3, 2014, Esposito installed Gondolfe as President, CEO, Chairman, and sole director of Cannabiz (still known as Lion Gold). Id. ¶ 39. Solely at Esposito's direction,

Gondolfe hired Pignatello as a consultant and unquestioningly signed false and misleading Cannabiz documents that Esposito and others placed in front of him. Id. ¶¶ 39–41.

In June 2014, Lion Gold issued a press release announcing that its name had changed to Cannabiz and that it had altered its business purpose from mining minerals in Brazil to mobile media and marketing focused on the medical marijuana industry. Compl. ¶ 44. In August 2014, in order to create more convertible debt to sell for a profit, Esposito caused Cannabiz to issue three additional convertible notes to Lionshare. Id. ¶¶ 45–47. He backdated these notes to appear as though they had been issued in 2012, thereby concealing from investors and financial intermediaries that the securities in question had not satisfied Rule 144's one-year holding period for securities held by an issuer's affiliates. Id.; 17 C.F.R. § 230.144(d)(1)(ii). Gondolfe, again following Esposito's direction, signed all three backdated notes, which were submitted to OTC Markets for publication. Compl. ¶ 46.

Esposito, Lionshare, Gondolfe, and Cannabiz then used these falsified documents to induce Cannabiz's transfer agent to convert the three backdated notes into millions of shares of Cannabiz stock certificates without restrictive legends, which facilitated the unregistered sale of these securities into the public market. Compl. ¶¶ 47−50. These documents included Cannabiz Board of Directors resolutions, signed by Gondolfe, which falsely represented that the notes had been created in 2012 and that Lionshare was not an affiliate of Cannabiz. Id. ¶ 48. Esposito, Lionshare, Gondolfe, and Cannabiz knew, or were reckless in not knowing, that the documents Gondolfe had signed contained false statements because (1) Gondolfe was not even employed by Cannabiz in 2012 (the date that appears on the backdated notes he had signed) and (2) Esposito and Lionshare controlled Cannabiz (and were therefore its affiliates). Id. ¶ 49. As a result, Cannabiz's transfer agent issued more stock certificates without restrictive legends, thereby

facilitating the sale of Cannabiz shares to the public markets notwithstanding the defendants' misrepresentation and concealment of the Rule 144 restrictions on the sale of the shares based on Esposito and Lionshare's undisclosed affiliate status. Id. ¶¶ 50–52.

Between August and September 2014, Cannabiz's transfer agent issued 8.1 million unlegended shares of Cannabiz to Lionshare, who then sold them to 11 investors for a profit of $120,575. Id. ¶ 50; Albers 2nd Decl. ¶ 8. At Esposito's request, the Cannabiz transfer agent also transferred 1.3 million shares from Lionshare to Esposito personally, more than 800,000 shares to Pignatello, and 1 million shares to Galizio. Compl. ¶ 50. By the end of September 2014, Esposito, Pignatello, and Galizio had deposited all of their Cannabiz shares with the same brokerage firm. Id. ¶ 51. Esposito knowingly or recklessly provided the firm with fraudulent documents that misrepresented Esposito and Lionshare's affiliation. Id. ¶¶ 51−52.

In October 2014, Esposito arranged for a stock promotion company to increase the price and trading volume of Cannabiz stock by sending out at least 13 email blasts that touted the stock's growth potential to prospective investors. Id. ¶¶ 53−54. Following the campaign, Cannabiz's stock price increased from approximately $0.05 to $0.09 between October 28 and October 29, and its trading volume increased to approximately 2 million shares per day from less than 10,000 shares per day. Id. ¶ 55. Around the same time, Esposito and other defendants sold their Cannabiz shares in the public market for a profit in violation of Rule 144's prohibitions on such sales by affiliates. Id. ¶¶ 55–59. On October 29, Esposito attempted to sell over 204,000 shares at approximately $0.12 per share, but his brokerage firm suspended his account based on information that he was involved with the promotional campaign. Id. Esposito and Lionshare also sold a portion of the Cannabiz promissory notes to two purchasers for a total of $303,734. Id. ¶¶ 60–62. Based on Esposito's misrepresentations regarding his and Lionshare's affiliation,

the two purchasers later converted the debt and sold hundreds of millions of Cannabiz shares into the public market between October 2014 and May 2015, in violation of Rule 144 and the Securities Act. Id. ¶ 63.

### B. Liability

#### 1. Liability under Section 5 of the Securities Act

The Complaint's Fifth Claim for Relief alleges that Esposito violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"). 15 U.S.C. § 77e(a), (c). Section 5(a) makes it unlawful for anyone to sell, directly or indirectly, securities through the use of any means or instruments of interstate commerce without an effective registration statement. 15 U.S.C. § 77e(a). Section 5(c) similarly prohibits offers to buy or sell securities unless a registration statement has been filed. 15 U.S.C. § 77e(c).

A *prima facie* case for a violation of Sections 5(a) and 5(c) requires a showing that: (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell or sold the securities; and (3) the offer or sale was made in connection with the use of interstate transportation, communication, or the mails. See SEC v. Spence & Green Chem. Co., 612 F.2d 896, 901–02 (5th Cir. 1980).

After reviewing the facts alleged in the Complaint, the Court finds that they sufficiently support the claims alleged in the SEC's Fifth Claim for Relief. First, the Complaint alleges that Esposito engaged in the sale or offering of Cannabiz stock and Lionshare Membership Interest Shares, which are "securities" as that term is defined in the Securities Act and the Exchange Act of 1934 ("Exchange Act"). 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). Compl. ¶ 77. The Complaint also alleges that Esposito personally engaged in these unregistered sales and offerings of securities, in violation of Section 5(a) and 5(c) of the Securities Act. Compl. ¶ 78. As the

Managing Director of Lionshare, between June 2011 and June 2012, Esposito raised $556,452 from 24 Lionshare investors by offering Lionshare Membership Interest Shares. Id. ¶¶ 2, 16; Ans. ¶¶ 2, 16; Albers 2nd Decl. ¶ 7. In a second sale or offering, between April 2014 and September 2014, Esposito, as an affiliate of Cannabiz, induced Cannabiz's transfer agent to issue Cannabiz shares without restrictive legends. Compl. ¶¶ 49−50. In the third and final sale or offering, between October 2014 and April 2015, Esposito sold a portion of Cannabiz's convertible debt. Compl. ¶¶ 60−62. Finally, the Complaint adequately alleges that these sales and offerings were made in connection with the use of interstate transportation, communication, or the mails. Id. ¶ 78. Thus, the SEC has made a *prima facie* showing that Esposito violated Sections 5(a) and 5(c) of the Securities Act.

Once the SEC pleads a *prima facie* violation of Section 5, the defendant bears the burden of proving that the securities or the transactions qualified for an exemption from registration. See SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953). Because Esposito has defaulted, he has not rebutted the SEC's *prima facie* showing. Therefore, the SEC has sufficiently demonstrated Esposito's Section 5 liability.

2.  Liability under Section 17 (a)(2) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b)

The Complaint's First and Second Claims for Relief allege that Esposito violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b). Section 17(a) of the Securities Act prohibits, in the offer or sale of securities: (1) devices, schemes, or artifices to defraud; (2) obtaining money or property by means of materially false or misleading statements or omissions; and (3) transactions, practices, or courses of business that operate as a fraud or deceit. 15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security, from,

directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made not misleading; or (3) engaging in any transaction, practice, or course of business that operates or would operate as a fraud or deceit upon any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; see also SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (quoting Rule 10b-5). In a civil enforcement action brought by the SEC itself, the SEC need not prove any investor's actual reliance on the misrepresentations. See Tambone, 597 F.3d at 447 n.9. Lastly, violations of Sections 17(a)(1) and 10(b) and Rule 10b-5 require proof of scienter, but claims based on Sections 17(a)(2) and 17(a)(3) do not. See Aaron v. SEC, 446 U.S. 680, 701–02 (1980) ("the [SEC] is required to establish scienter as an element of a civil enforcement action to enjoin violations of § 17(a)(1) of the 1933 Act, § 10(b) of the 1934 Act, and Rule 10b-5 . . . [but] need not establish scienter as an element of an action to enjoin violations of § 17(a)(2) and § 17(a)(3) of the 1933 Act.").

Section 10(b) and Rule 10b-5(b) thereunder prohibit "mak[ing] any untrue statement of a material fact in connection with the purchase or sale of securities." Janus Cap. Grp. v. First Derivative Traders, 564 U.S. 135, 141 (2011) (quoting Rule 10b-5). The Complaint alleges that Esposito made misrepresentations and omissions to investors in the PPM. Compl. ¶ 19. The PPM specifically represented to investors that the proceeds of the Lionshare offering of Membership Interest Shares would be used to acquire Lion Gold, which would be used to acquire mineral interests and mining operations. Id. Once the acquisition of Lion Gold was complete, the Lionshare investors were to receive one share of Lion Gold common stock for each Membership Interest Share they held. Id. The PPM went on to provide a breakdown of how the investor funds would be used. Id. ¶ 20. Contrary to these representations, however, over $290,500 of the

investor funds were used by Esposito for unauthorized personal and business expenses. Id. ¶ 21. In addition, between August 2011 and November 2012, approximately $153,000 of investor funds were used to form Lion Mineracao. Id. ¶ 22. Despite the fact that investor funds were used to fund Lion Mineracao, Esposito owned 99.99% of the company while Lionshare investors owned nothing. Id.; London 2nd Decl., Ex. A at 32–33, 43–44, 46, 56–58. Esposito also misrepresented to the public and Cannabiz's transfer agent that Lionshare and Esposito were not affiliates of Cannabiz in order to accomplish the issuance of stock certificates without a restrictive legend. Compl. ¶¶ 27–37.

Section 17(a)(2) prohibits obtaining money or property by means of materially false or misleading statements or omissions in the offer or sale of securities. 15 U.S.C. § 77q(a)(2). In addition to the misrepresentations discussed above, which resulted in Esposito and Lionshare raising at least $556,452 and Esposito's use of a portion of those funds for unauthorized personal and business expenses, the Complaint alleges that Esposito also obtained money by making numerous misstatements submitted to Cannabiz's transfer agent, which induced the issuance of millions of shares of common stock without the restrictive legend. Compl. ¶¶ 48–50.

The SEC has also adequately alleged that these misstatements were material. Id. ¶ 65. A fact is material if a reasonable investor would view disclosure of the fact "as having significantly altered the total mix of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231–232 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). The misstatements contained in the Lionshare PPM were material because they influenced Lionshare investors to invest in the unregistered offering of Membership Interest Shares under the belief that their money would be used to purchase Lion Gold, which would then be used to acquire mineral interests and mining operations, Compl. ¶¶ 16–21, although the reality was that Esposito

"planned to use the money for his own purposes," see SEC v. Zada, 787 F.3d 375, 382 (6th Cir. 2015) (finding materiality where investors were told their money would be used to buy oil, "when in fact [the defendant] planned to use the money for his own purposes").

With respect to the misstatements and omissions regarding Lionshare's status as an affiliate of Cannabiz, these misstatements and omissions were material because they influenced Cannabiz's transfer agent to issue stock certificates without the restriction that would have prohibited their sale prior to the expiration of the Rule 144 one-year holding period. Compl. ¶ 30. Consequently, hundreds of millions of Cannabiz shares were sold to the investing public despite legal prohibitions on those sales. Id. ¶ 63; see Joyce v. Joyce Beverages, Inc., 571 F.2d 703, 707 (2d Cir. 1978) (finding a "statement about the potential availability of Rule 144 could have misled the reasonable shareholder into thinking that [Rule 144] was, in fact, available to him").

The SEC also sufficiently alleged that Esposito acted with the scienter required for § 17(a)(1) and § 10(b) liability (but not required for § 17(a)(2) or § 17(a)(3) liability). See Aaron, 446 U.S. at 701–02. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). It may be proven by indirect evidence and may include extreme recklessness. See In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002). Recklessness involves "an extreme departure from the standards of ordinary care [that] presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999) (internal citation omitted).

Here, the Complaint alleges Esposito misappropriated Lionshare investor funds for unauthorized personal purposes. Compl. ¶ 21. The Complaint further alleges that Esposito was the orchestrator of the scheme to actively hide his and Lionshare's status as an affiliate of

Cannabiz to induce Cannabiz's transfer agent to issue stock certificates without the restriction

that would have prohibited their sale prior to the expiration of the one-year holding period, which

caused hundreds of millions of Cannabiz shares to be sold to the public despite the legal

prohibition on their sale. Id. ¶¶ 30, 63. As part of the scheme, Esposito instructed Gondolfe to

sign backdated notes and other fraudulent corporate documents and regulatory filings that were

disclosed to investors and the public and submitted to Cannabiz's transfer agent.[4] Id. ¶¶ 45–50.

Thus, the SEC has adequately established Esposito's liability under § 17(a)(2), § 10b, and

Rule 10b-5(b).

3. Scheme Liability under § 17(a)(1), (a)(3) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5(a), (c)

The SEC next alleges that Esposito engaged in a scheme that violated § 17(a)(1) and §

17(a)(3) of the Securities Act and § 10(b) of the Exchange Act and Rule 10b-5(a), (c) thereunder

(First and Third Claims for Relief). Scheme liability arises where the defendants employ a

deceptive device for the purpose of defrauding investors. See SEC v. Durgarian, 477 F. Supp. 2d

342, 351–52 (D. Mass 2007).

Here, Esposito conducted a scheme to misuse investor money and to create the deceptive

appearance that Cannabiz securities were not subject to trading restrictions. He directly or

indirectly fabricated corporate documents and regulatory filings, and submitted them to

Cannabiz's transfer agent, along with false attorney opinion letters, to induce the transfer agent

to issue hundreds of millions of purportedly unrestricted Cannabiz shares that were ultimately

---

[4] Because Esposito asserted his Fifth Amendment privilege against self-incrimination as to the vast majority of questions asked of him during the investigation, including questions regarding his intent to conduct a brazen scheme to violate the securities laws, the Court may draw an adverse inference. See Baxter v. Palmigiano, 425 U.S. 308, 320 (1976); SEC v. Druffner, 517 F. Supp. 2d 502, 510–11 (D. Mass. 2007), aff'd, SEC v. Ficken, 546 F.3d 45 (1st Cir. 2008).

sold to the investing public despite the trading prohibitions on their sale. Compl. ¶¶ 45–48, 63.

Moreover, as stated above, the SEC has adequately alleged that Esposito acted with scienter, an

element required by § 17(a)(1) and § 10(b) (but not required for § 17(a)(3) liability). See Aaron,

446 U.S. at 701–02.

Because the SEC's Complaint adequately alleges that Esposito had engaged in a scheme

to defraud with scienter, the Court finds that the SEC has properly shown Esposito's liability

under § 17(a)(1), § 17(a)(3), and Rule 10b-5(a), (c).

## IV.    RELIEF

### A.    Disgorgement

In light of Esposito's default, the SEC has requested that the Court enter an Order of

Disgorgement and Prejudgment Interest. In a case involving violations of the federal securities

laws, the Court has "broad discretion not only in determining whether or not to order

disgorgement but also in calculating the amount to be disgorged." SEC v. Druffner, 802 F. Supp.

2d 293, 297 (D. Mass. 2011) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474–75 (2d

Cir. 1996)). The amount of disgorgement "need only be a reasonable approximation of profits

causally connected to the violation," and the "risk of uncertainty in calculating disgorgement

should fall on the wrongdoer whose illegal conduct created that uncertainty." SEC v. Happ, 392

F.3d 12, 31 (1st Cir. 2004) (internal quotations and citation omitted).

On April 14, 2017, the Court entered a Memorandum and Order [ECF No. 90] and

Default Judgment [ECF No. 91] against Lionshare, which held it liable for disgorgement of

$980,761 representing profits gained as a result of the conduct alleged in the Complaint, together

with prejudgment interest thereon in the amount of $126,652, for a total of $1,107,413. As

explained therein, after reviewing the Second Declaration of Mark Albers, the SEC's forensic

accountant, the Court found that the disgorgement amount and prejudgment interest requested by the SEC reasonably approximated profits causally connected to the illegal conduct alleged in the Complaint, and found no error in Mr. Albers' calculations, which represented a reasonable approximation of profits casually connected to Lionshare's violations. [ECF No. 90 at 17].

The SEC now seeks to hold Esposito jointly and severally liable for the total disgorgement and prejudgment interest amount assessed to Lionshare. Because Lionshare and Esposito's violations are "so closely intertwined," as illustrated above, Esposito will be held jointly and severally liable with Lionshare for disgorgement and prejudgment interest of $1,107,413. SEC v. Locke Capital Management, Inc., 794 F. Supp. 2d 355 (D.R.I. 2011) (holding entity and entity's sole owner, an individual, jointly and severally liable for disgorgement); see SEC v. Tropikgadget FZE, 146 F. Supp. 3d 270, 282 (D. Mass. 2015) (holding defendants "jointly and severally liable" for disgorgement amount with prejudgment interest); First Jersey Sec., Inc., 101 F.3d at 1475–76 ("[W]here a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations . . . it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order.").

B.      Civil Penalties

The SEC further argues that the Court should impose civil penalties upon the defaulting defendant, Esposito, pursuant to § 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and § 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). Those statutes authorize the Court to determine the amount of the penalty "in light of the facts and circumstances." 15 U.S.C. §§ 78u(d)(3)(B)(i), 77t(d)(2)(A); see SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) ("The tier

determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."). "Both statutes provide three tiers of penalties, the amount increasing with the severity of the violation." SEC v. Manterfield, No. CIV A 07-10712-RGS, 2009 WL 935953, at *1 (D. Mass. Apr. 8, 2009). The "Tier I penalties are generally applicable . . . . Tier II penalties require 'fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement,' . . . and Tier III penalties require the Tier II elements plus 'substantial losses or . . . significant risk of substantial losses to other persons.'" Kern, 425 F.3d at 153 (quoting 15 U.S.C. § 77t(d)(2)) (internal citations omitted).

"Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." SEC v. Monterosso, 756 F.3d 1326, 1338 (11th Cir. 2014) (citing SEC v. Sargent, 329 F.3d 34, 41 n.2 (1st Cir. 2003)). In determining the appropriate fine, courts have considered factors including the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation with authorities or lack thereof, and the defendant's current financial condition. See, e.g., SEC v. Converge Glob., Inc., No. 04-80841CV, 2006 WL 907567, at *6 (S.D. Fla. Mar. 10, 2006); SEC v. Cavanagh, No. 98-1818DLC, 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004).

In imposing a civil penalty on Lionshare, this Court found the following:

[A] third-tier penalty against Lionshare is warranted. Lionshare was instrumental in an illicit scheme to evade the securities laws' registration requirements. Lionshare, through Esposito, acted with scienter in misappropriating investor funds for Esposito's unauthorized personal use, . . . actively hiding its status as an affiliate of Cannabiz in order to induce Cannabiz's transfer agent to issue unrestricted stock certificates, . . . and in instructing Gondolfe to issue three backdated notes to Lionshare, which were then submitted to OTC Markets for publication . . . .

Lionshare's actions caused investors to suffer substantial losses when the Cannabiz shares they had bought became worthless after the conversion of Cannabiz debt and

the dumping of millions of Cannabiz shares into the public markets. Private investors who purchased Cannabiz's convertible debt also sustained losses. In addition, Lionshare has not accepted responsibility for its actions—having defaulted and failed to appear before this Court to defend or explain its conduct. The Court, therefore, imposes a third-tier civil penalty on Lionshare of $775,000.

Here, the SEC requests that the Court impose a Tier III (third-tier) penalty against Esposito. [ECF No. 116 at 17–19]. The Court finds that, based on the allegations in the SEC's Complaint, a third-tier penalty of $160,000 against Esposito is warranted. See 15 U.S.C. § 78u(d)(3)(B)(iii); 15 U.S.C. § 77t(d)(2)(C); 17 C.F.R. § 201.1001. The SEC declined to name a specific dollar amount in its request for a civil penalty, in order to allow the Court flexibility in imposing a proper amount. Here, Esposito conducted an illicit scheme to misappropriate investor funds and to evade the registration provisions of the securities laws, including the creation and use of false corporate documents undertaken to induce Cannabiz's transfer agent to issue millions of shares of Cannabiz stock without a restrictive legend, thereby facilitating the unregistered sale of these securities into the public market. Esposito's conduct caused substantial losses to investors whose Cannbiz shares became worthless after the conversion of Cannabiz debt and the dumping of millions of Cannabiz shares on the public markets. Esposito has not taken responsibility for his actions, as he has twice failed to appear at his properly-noticed deposition in this action. Accordingly, the Court imposes a third-tier civil penalty on Esposito of $160,000. See 17 C.F.R. § 201.1001 and Table 1.

### C. Permanent Injunction

The SEC has also requested that the Court enter a permanent injunction enjoining Esposito from committing further violations of the federal securities laws. See 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future." SEC v.

Druffner, 517 F. Supp. 2d 502, 513 (D. Mass. 2007) (citation omitted). To determine whether the defendant is reasonably likely to violate the laws again in the future, the Court looks to "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." Id. (quoting SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994)). In light of the Court's previous entry of a permanent injunction against Lionshare [ECF No. 90], and the allegations in the Complaint, which describe an elaborate and deliberate scheme to defraud investors, the Court finds that a permanent injunction enjoining Esposito from committing further violations of the federal securities law is warranted.

### D. Director/Officer Bar

The SEC next requests that this Court bar Esposito from serving as a public company's officer or director. This Court has already imposed a similar bar against Gondolfe for his contributions to Esposito's scheme to defraud investors. [ECF No. 62]. Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act authorize a court in an SEC enforcement action to bar or suspend a defendant from serving as an officer or director of a public company, "conditionally or unconditionally, and permanently or for such period of time as [the Court] . . . shall determine." 15 U.S.C. § 77t(e); 15 U.S.C. § 78u(d)(2). Pursuant to that statutory authority, the Court has substantial discretion to determine whether a defendant is unfit to serve as a public company's officer or director. See SEC v. Selden, 632 F. Supp. 2d 91, 97 (D. Mass. 2009) (citing SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995)).

The facts alleged in the SEC's Complaint demonstrate Esposito's lack of fitness to serve as a public company's officer or director. While covertly controlling the public company Cannabiz, Esposito intentionally hid his control, falsified and backdated corporate documents,

and colluded in the sale of millions of shares of Cannabiz into the public market in violation of SEC statutes and regulations. Therefore, the Court deems it appropriate to permanently bar Esposito from serving as a public company's officer or director. See SEC v. Spencer Pharm., No. 12-cv-12334-IT, 2015 WL 5749436, at *8 (D. Mass. Sept. 30, 2015) (imposing officer/director bar on defendant who had engaged in a manipulation scheme using false corporate information).

### E.    Penny Stock Bar

Lastly, the SEC requests a similar order barring Esposito from participating in penny stock offerings. This Court has already entered a similar bar against both Gondolfe and Lionshare [ECF Nos. 62, 93, 94]. Section 20(g)(1) of the Securities Act and Section 21(d)(6)(A) of the Exchange Act give the Court discretion to bar a defendant from offering or selling penny stocks. 15 U.S.C. § 77t(g)(1); 15 U.S.C. § 78u(d)(6)(A). Such a bar may be "conditional[ ] or unconditional[ ], and permanent[ ] or for such period of time as the court shall determine." Spencer, 2015 WL 5749436, at *8 (quoting 15 U.S.C. §§ 77t(g)(1), 78u(d)(6)(A)). Here, Cannabiz's stock traded as a penny stock as defined in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder. 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51-1. For many of the same reasons that justify the director/officer bar against Esposito, the Court deems a permanent penny stock bar against Esposito appropriate and in the public interest.

## V.    CONCLUSION

For the foregoing reasons, the SEC's Motion for Default Judgment against Esposito [ECF No. 115] is GRANTED.

### SO ORDERED.

April 30, 2018                                          /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE